JACOB S. LAROE and others *vs.* MARCUS B. DOUGLASS, surviving executor of Samuel Laroe.

The law is well settled in this state, that when executors jointly settle their final account they are jointly liable for the balance so ascertained.

In such case the parties interested may rely on the settlement, and are not driven to a discovery in whose hands the funds are or in what proportion the executors are liable.

If a trustee, by his own negligence, suffers his cotrustee to receive and waste the trust fund, when he had the means of preventing such receipt and waste by the exercise of reasonable care and diligence, he will in such case be held personally responsible for the loss.

*Keasby,* for complainants.

*Bradley,* for defendant.

THE CHANCELLOR. This bill is filed by two of the children and legatees of Samuel Laroe, deceased, against his surviving executor, for an account of the estate and the recovery of legacies bequeathed by the will of the testator.

The evidence in the cause satisfactorily establishes the following facts. Samuel Laroe, the testator, died on the 2d of May, 1828. By his last will, after making bequests to his younger children, he directs his real and personal estate to be sold on the death or marriage of his widow, and to be divided equally among all his children. Marcus B. Douglass and James S. Laroe, the eldest son of the testator, were appointed executors. The widow died on the 5th of March, 1831. The executors, having made sale of the real and personal estate, exhibited their joint account for settlement to the Orphans Court of the county of Morris at March term, 1836. By the decree of settlement there was ascertained to be a balance in the hands of the executors sufficient, after satisfying all the specific legacies, to leave a fund for distribution among all the

children pursuant to the will.   The homestead farm was sold and conveyed by the executors, in 1834, to John and Abram Laroe, two of the testator's sons.   At the date of this sale, three of the testator's children were minors, and not entitled, by the terms of the will, to their respective shares of the estate.   To secure their portions, a bond and mortgage was given by the purchasers to the executors, in the sum of $1656.68, conditioned to pay to the two sons, Peter and Jacob, $613 each, and to the daughter, Hannah, $430.68, when, by the terms of the will, they should be entitled to receive their respective portions, the interest in the meantime to be paid to the executors or to any other person legally authorized to receive it.   This bond and mortgage were held by the executors at the time of their final settlement, the children still being in their minority, and constituted a part of the estate in the hands of the executors.   About the date of the settlement in the year 1836, the mortgagors conveyed the farm to James S. Laroe, one of the executors and mortgagees, the mortgage debt being suffered to remain as a part of the purchase money, and the mortgage left uncancelled upon record. At this period the bond and mortgage were in the hands of Samuel S. Laroe, who appears to have delivered the bond to the obligors, but retained the mortgage.   On the 30th of March, 1840, the legatees still being under age, the mortgaged premises were conveyed by James S. Laroe to Alexander Davis, who refused to take title until the farm was free from encumbrance.   The mortgage was thereupon surrendered by James S. Laroe, and on the 1st of April was cancelled of record.

In the spring of 1850, the farm was sold and conveyed by Alexander Davis to Brown and Bigelow.   Jacob Laroe, one of the complainants and one of the *cestui que trusts* under the mortgage, objected to the sale ; but after a consultation the objection was waived, and the title permitted to be made.   In the fall of 1850, James S. Laroe, one of the executors, left the state of New Jersey

and went to Texas, where he died on the 18th of March, 1854. On the 9th of June, 1854, this bill was filed against Marcus B. Douglass, the surviving executor, for the recovery of the shares of Jacob and Hannah, two of the legatees and two of the *cestui que trusts* under the bond and mortgage taken by the executors, in 1834, for the security of those shares.

Upon this state of facts the first and most material question in the cause is, whether the surviving executor is liable for those legacies to the complainants, admitting them to remain unpaid. The bond and mortgage given in 1834 for the security of the legacies were made to the executors jointly. The final settlement made by the executors in 1836 was a joint settlement, and the decree finds the balance to be in the hands of the executors. Up to this period Douglass appears to have had an active participation in the management of the estate, if not its entire control. The bond and mortgage were drawn by him. After the settlement it does not appear that he had any further active participation in the business. He removed from the neighborhood, and the bond and mortgage passed into the hands of his coexecutor.

The law is well settled in this state, that when executors exhibit for settlement a joint account, and when, by the decree of the Orphans Court, such account is finally settled and allowed, the executors are jointly charged with the balance thus ascertained to be in their hands. The decree is in the nature of a judgment. By the terms of the statute it is conclusive upon all parties, none of whom will be permitted to set up any matter in avoidance of its operation.

This doctrine was distinctly announced by Chancellor Williamson in *Dunn* v. *Executors of Dunn*, and although that decree was reversed by the Court of Appeals, the same doctrine was subsequently held, and the principle upon which it rests distinctly enunciated by Chancellor Vroom in *Fenimore* v. *Fenimore*, 2 *Green's Chan. R.* 296, and *note*.

If the executor is unwilling to incur joint liability with his coexecutor he may avoid it by accounting separately for the funds which come to his hands. *Bellerjeau* v. *Executors of Kotts*, 1 *South.* 359.

If he account jointly, and submit to a decree finding the funds in the hands of the executors jointly, the parties interested may rely on the decree, and are not driven to the necessity of discovering in whose hands the funds are, or in what proportion the executors are liable for their loss.

But it is urged that, after the money had been invested for the benefit of the minor legatees, and after the final settlement of the estate, the executors were divested of their character and liability as executors, and became simply trustees for the estates of the minor children. If this change of character involves a change of liability to the legatees it will be difficult to sustain the position either upon principle or upon policy. By the joint settlement and decree thereon they are jointly liable as executors. Can it be that they are absolved from that liability by simply loaning the money in their own names or as executors for the benefit of the parties entitled? The bill is against the defendant as executor for the recovery of legacies. He has not been divested of his office nor absolved from his duties as executor. The legacies have never been paid either to the legatees or to their trustees. How, then, is the defendant to claim exemption from liability on the ground that he is not executor but a trustee? No such defence is raised or suggested by the answer, nor does it seem to be in any view tenable.

But admitting, for the sake of the argument, that the defendant was before the court, not as executor but as a surviving trustee, is he exempt from liability in that character? It is in evidence that he permitted the securities for this money to be taken by his cotrustee, by whom they were afterwards improperly given up and cancelled. That cotrustee became the owner of the mort-

gaged premises. In his hands the encumbrance of the mortgage debt remained upon the estate. When he was about to make sale Douglass was apprized of it, and notified the intended purchaser of the encumbrance. His cotrustee thereupon called upon Douglass, informed him that he could not make sale except by cancelling the mortgage, and that *he* would pay the *cestui que trusts*. If Douglass did not consent he did not actively oppose the meditated wrong. He afterwards wrote to the clerk of the county, requesting him not to suffer the mortgage to be cancelled of record. He received a reply from the clerk, that if the mortgage was presented to him cancelled he did not know that he could refuse to cancel it of record. He had then full knowledge of the meditated wrong, and he was bound to interfere actively to prevent it. He might have restrained the completion of the sale and the fraudulent surrender of the mortgage. He might, at least, have given notice to the intended purchaser of the nature of the encumbrance upon the property, of his dissent from the cancellation of the mortgage, and thus have continued the equitable lien notwithstanding the surrender of the bond and the fraudulent cancellation of the mortgage. But the evidence shows that he stood unresistingly by and permitted the wrong to be perpetrated.

The rule in England upon this subject is very strict. Where several trustees are appointed, and have accepted the trust, it is the duty of each one to protect the trust property from the acts of his colleagues ; and if, through the neglect of this duty, any of the trustees have been enabled to misappropriate or otherwise occasion any loss to the trust estate, the others, *as a general rule*, will be personally answerable to the *cestui que trusts* for the amount of the loss, although they had not been engaged in or benefited by the breach of trust.

So if a trustee stand by and suffer his cotrustee to retain the exclusive possession and control of the trust

funds, and they are lost or wasted by the cotrustee, the nonacting trustee will be decreed personally to make good the loss. *Hill on Trustees* 309.

The rule, as stated by Mr. Justice Story, is somewhat less rigid. A trustee must act with reasonable diligence, and in case of a joint trust must exercise due caution and vigilance in respect to the approbation of and acquiescence in the acts of his cotrustees; for if he should deliver over the whole management to the others, and betray supine indifference or gross negligence in regard to the interests of the *cestui que trusts*, he will be held responsible. 2 *Story's Eq.* § 1275.

So if a trustee, by his own negligence, suffers his cotrustee to receive and waste the trust fund when he has the means of preventing such receipt and waste by the exercise of reasonable care and diligence, he will in such case be held personally responsible for the loss. *Story's Eq.* § 1283.

If, therefore, the defendant could divest himself of the character of executor, it is not perceived how, under the evidence in this case, he could be relieved from liability.

The claim is not barred by the statute of limitations, nor can it be rejected as a stale claim, not entitled to the protection or favor of a court of equity. One of the complainants came of age in 1841, the other in 1845. Payments were made by one of the executors on account of both the claims as late as 1850, a short time before he finally left the state. The bill was filed against the surviving executor in 1854, within three months after the death of James S. Laroe, and within four years of the date of the last payment.

Among the various grounds of defence presented upon the argument, it was urged that Douglass was discharged from liability on the ground that at the sale of the mortgaged premises by Davis, Jacob, one of the complainants, objected to the sale, but afterwards waived his objection, and consented (in the language of the witness) to look to

his brother James for the balance of his share of his father's estate. If the mortgage had been cancelled, or the equitable lien of the *cestui que trusts* upon the mortgaged premises released by their own act, there might have been some weight in the objection. But this sale took place, and the alleged conversation occurred in 1850, ten years after the mortgage had been cancelled by the consent, express or implied, of both the mortgagees, and when the lien of the mortgage debt, legal or equitable, was entirely extinguished. The objection or consent, therefore, of the *cestui que trusts* to the sale was nugatory and could affect no existing right. Nor could his agreeing to look to his brother, and not to the land, release the coexecutor from any existing liability. The coexecutor was not present, and the statement was made with a totally different purpose in view. It is highly probable that, at the time, the legatee was ignorant that the coexecutor was in any wise liable for the legacies due from the estate.

The evidence now before the court does not show that the legacies have been paid in full. The complainants are entitled to an account. There must be a reference to a master to ascertain the amount, if any, due to the complainants respectively.